UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

MC LOUISIANA MINERALS, LLC          CIVIL ACTION NO. 12-1237

VERSUS                              JUDGE S. MAURICE HICKS, JR.

SAM T. SEARCY, ET AL.               MAGISTRATE JUDGE HORNSBY

MEMORANDUM RULING

Before the court is a motion for summary judgment or, alternatively, a motion in limine to exclude expert testimony filed by Sam T. Searcy and Roland M. Searcy (collectively "defendants"). See Record Document 36. The motion primarily seeks dismissal of MC Louisiana Minerals, L.L.C.'s ("MCLM") claims on the ground that MCLM cannot establish a prima facie case. See id. In the event the motion for summary judgment is denied, the defendants alternatively seek to exclude the testimony of MCLM's expert, Richard Kennedy ("Mr. Kennedy"). See id. For the reasons stated herein, the defendants' motion for summary judgment is **DENIED** and the defendants' motion in limine is **DENIED.**

I.      BACKGROUND

The instant lawsuit arises from the disputed sale of a mineral servitude covering one-half of the minerals under a 240-acre tract of land in DeSoto Parish, Louisiana. The defendants inherited the mineral servitude at issue from their mother, Lois Searcy, when she died in 1984. Prior to her death, in 1980, Lois Searcy leased her mineral rights to Jeems Bayou Production ("Jeems"). Jeems thereafter drilled a well on the property and established production. See Record Document 36, Statement of Undisputed Material Facts and Ex. C. MCLM approached the defendants in August 2010 and offered to purchase

their mineral rights.  See id., Statement of Undisputed Material Facts and Ex. A.  The defendants accepted the offer, ultimately executing separate mineral deeds conveying their respective mineral rights to MCLM.  See id., Statement of Undisputed Material Facts; Record Document 40, Exs. H and J.  The deeds were executed on November 28 and 29, 2010, but both were effective August 1, 2010.  Both deeds contained warranties of title.  See Record Document 40, Exs. H and J.  MCLM alleges it collectively paid the defendants $1.38 million for their mineral rights.  See Record Document 22 at ¶¶ 6-9.

MCLM's second amended complaint raises multiple causes of action, each of which claims that, at the time the mineral deeds were executed, the defendants no longer owned the mineral rights they purported to transfer to MCLM.  See id.  Specifically, MCLM argues that the defendants' mineral servitude was extinguished by prescription of non-use because no production had occurred or been attempted in over ten years.  The defendants contend that a well on the property last produced in November 2002 and, therefore, prescription of non-use had not yet run when the mineral deeds were executed in 2010.  See Record Document 36.

The well at issue in this case is the Searcy No. 2 well.  The production history of this well is documented in public records maintained by the Louisiana Department of Natural Resources' Office of Conservation ("Office of Conservation").  Jeems completed the Searcy No. 2 well on July 22, 1982.  See Record Document 40, Ex. B.  The well produced sporadically from September 1982 to June 1985, did not produce anything from July 1985 until January 1990, and then produced consistently from February 1990 to March 1992.  See id., Ex. B.  In May 1992, the Searcy No. 2 well's status was listed as "shut-in productive - no future utility."  See id., Exs. B and C.  The Searcy No. 2 well returned to

"active - producing" status in April 1996, and produced at consistently high levels until January 2000.  See id., Exs. B and C.  Following low levels of production in February, March, and April of 2000, the Office of Conservation's records show that the Searcy No. 2 well produced on only one other occasion—in November 2002, the same month the well's status was changed to "shut-in productive - future utility."  See id., Exs. B and C.  The well was plugged and abandoned on January 4, 2011.  See id.

Jeems operated two additional wells—the Bryson well and Thigpen Estate well—in the same area[1] as the Searcy No. 2 well.  See id., Ex. D.  Jeems's original monthly production report for November 2002, completed on January 21, 2003, showed no production for any of the three wells.  A correction issued on May 2, 2003, showed production only from the Bryson and Searcy No. 2 wells.  Specifically, the correction states the Searcy No. 2 well produced 239 mcf (thousand cubic feet), just as the Office of Conservation's records show.  See id., Exs. B and D.  Both Jeems's production reports for 2002 and the Office of Conservation's records show that the Thigpen Estate well produced consistently from August through December, except for November, while the Searcy No. 2 well did not produce anything except the 239 mcf in November.  See id., Exs. B, D, and E.  Moreover, the Office of Conservation's records show that the Thigpen Estate well continued producing until September 2003, whereas the Searcy No. 2 well never produced again.  See id., Exs. B and E.

MCLM filed the instant lawsuit on February 7, 2012, in the United States District Court for the Southern District of Texas.  See Record Document 1.  The defendants filed

---

[1]All three wells were located in an area known as the Benson field, but only the Searcy No. 2 well was located on the defendants' property.

a motion to transfer the case to this court, and an order was entered transferring the case on May 14, 2012.  <u>See</u> Record Documents 7 and 9.  MCLM thereafter filed a first amended complaint and a second amended complaint.  <u>See</u> Record Documents 17 and 22.  The defendants filed the instant motion for summary judgment or, in the alternative, a motion <u>in limine</u> to exclude the testimony of Mr. Kennedy, on December 2, 2013.  <u>See</u> Record Document 36.  MCLM opposed the motion and the defendants filed a reply.  <u>See</u> Record Documents 40 and 41.  MCLM subsequently filed a motion for leave to file a supplemental opposition memorandum.  <u>See</u> Record Document 42.  The court granted the motion for leave, entering MCLM's supplemental opposition into the record.  The defendants timely filed a supplemental reply.  <u>See</u> Record Documents 44, 45, and 46.

## II.   LAW AND ANALYSIS

### A.   Summary Judgment Standard.

Federal Rule of Civil Procedure 56(a) provides, in pertinent part:

> (a)   Motion for Summary Judgment or Partial Summary Judgment.
>
> A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).  "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  <u>Patrick v. Ridge</u>, 394 F.3d 311, 315 (5th Cir. 2004).  If the movant demonstrates the absence of a genuine dispute of material

fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine [dispute] for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004).  Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted.  See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005).  The Fifth Circuit has cautioned that "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy" the nonmovant's burden in a motion for summary judgment.  Ramsey v. Henderson, 286 F.3d 264, 269 (5th Cir. 2002).

**B.    Breach Of Warranty Against Eviction.**

MCLM's second amended complaint alleges seven distinct causes of action against the defendants.  The defendants contend, and this court agrees, that this case presents a claim for breach of the warranty against eviction.  The warranty against eviction is simply a warranty of good title.  Under Louisiana law, all sellers are bound by the warranty against eviction unless the parties agree otherwise.  See La. Civ. Code arts. 2475, 2500, and 2503. "The seller warrants the buyer against eviction, which is the buyer's loss of, or danger of losing, the whole or part of the thing sold because of a third person's right that existed at the time of the sale." La. Civ. Code art. 2500.  The mineral deeds executed by the parties explicitly included warranties of title.  See Record Document 40, Exs. H and J.  MCLM's lawsuit presents a breach of warranty against eviction claim because MCLM alleges that the defendants' mineral servitude expired prior to the sale, causing the mineral rights to return to the surface owner and leaving the defendants with no rights to transfer to MCLM. Moreover, MCLM seeks recovery of the purchase price, which is the remedy available in a breach of warranty action as opposed to a breach of contract claim.  Compare La. Civ.

Code art. 2506 ("A buyer who avails himself of the warranty against eviction may recover from the seller the price he paid . . . .") with J. Weingarten, Inc. v. Northgate Mall, Inc., 404 So. 2d 896, 897 (La. 1981)("[S]pecific performance is the preferred remedy for breach of a contract . . . .").

A buyer seeking recovery of the purchase price due to an alleged breach of the warranty against eviction, such as MCLM, can recover in only three instances: 1) if the buyer was physically evicted by a rightful owner; 2) if, after the sale, the buyer acquires better title to the property from another seller; or 3) if the buyer can prove a third party has "perfect title" to the property.  See Crown Zellerbach Corp. v. Henderson, 483 So. 2d 190, 191 (La. App. 2d Cir. 1986); Leon McQueen Lumber Co. v. Baer, 391 So. 2d 1198, 1201-02 (La. App. 1st Cir. 1980); Watson v. Big T Timber Co., 382 So. 2d 258, 261-62 (La. App. 3d Cir. 1980).   MCLM does not allege it was physically evicted from the property. Additionally, MCLM does not claim that it acquired better title to the property from another after it executed the mineral deeds with the defendants.[2]  Therefore, MCLM must prove that, at the time the mineral deeds were executed, someone other than the defendants had perfect title to the mineral rights.

The defendants argue that, because this is a breach of warranty case, MCLM must prove its claim that a third party had perfect title with "legal certainty."  See Record Documents 36, 41, and 45.  The court finds this argument unpersuasive.  "Legal certainty" appears to be a burden of proof that is unique to community property disputes.  See Salley

_____

[2]MCLM's parent company, Chesapeake Louisiana, L.P., executed an oil and gas lease with the purported surface owners in January 2011.  See Record Document 40, Ex. L.

v. Salley, 647 So. 2d 1164, 1168 (La. App. 3d Cir. 1994); Allbritton v. Allbritton, 561 So. 2d 125, 128 (La. App. 3d Cir. 1990). A careful analysis of the cases the defendants cite shows that "legal certainty" is merely used to state a conclusion—once a buyer shows perfect title in a third person, it is legally certain that the seller did not have title and, as a matter of law, the warranty against eviction was breached. See Bologna Bros. v. Stephens, 206 La. 112, 117-18 (La. 1944); Abney v. Levy, 169 La. 159, 161-62 (La. 1929); Addison v. Thompson, 556 So. 2d 195, 197-98 (La. App. 2d Cir. 1990). Therefore, the court declines to apply the heightened burden of proof, i.e., the "legal certainty" standard, the defendants seek to impose upon MCLM.

### C.   Mineral Servitudes, Prescription Of Non-Use, And Good Faith Operations.

Louisiana law does not recognize mineral rights as separate estates. Rather, mineral rights exist separate from the surface only as mineral servitudes. See Petro-Hunt, L.L.C. v. U.S., 365 F.3d 385, 388 (5th Cir. 2004). The holder of a mineral servitude owns the right to explore for and produce minerals from the land. See La. R.S. §§ 31:21-26; Petro-Hunt, 365 F.3d at 388. To ensure mineral rights are being used productively, mineral servitudes are extinguished by prescription of non-use after ten years. See La. R.S. § 31:27; Petro-Hunt, 365 F.3d at 388. Prescription of non-use is only interrupted by "good faith operations for the discovery and production of minerals." La. R.S. § 31:29. MCLM contends that a breach of the warranty against eviction occurred because prescription of non-use extinguished the defendants' mineral servitude prior to the execution of the mineral deeds, consequently vesting perfect title to the mineral rights in the surface owners.

The defendants contend they are entitled to summary judgment because the Office of Conservation's records show that the Searcy No. 2 well last produced in November 2002, and consequently prescription of non-use had not run at the time they sold their interests to MCLM.  The defendants are correct that the Office of Conservation's records are considered public records and prima facie evidence of the facts state therein.  See Casso v. Ascension Realty Co., 195 La. 1, 15-16 (La. 1940); Enerquest Oil & Gas, LLC v. Asprodites, 843 So. 2d 535, 541 (La. App. 1st Cir. 2003); Taylor v. Smith, 619 So. 2d 881, 884 (La. App. 3d Cir. 1993).  The Office of Conservation's records reflect that the Searcy No. 2 well produced 239 mcf in November 2002.  See Record Document 40, Ex. B. Additionally, the production reports of Jeems, the well operator, also attribute 239 mcf of production to the Searcy No. 2 well in November 2002.  See id., Ex. D.

Conversely, MCLM argues that the reported 239 mcf production for the Searcy No. 2 well in November 2002 is an error and that the well did not produce anything.  A review of the record evidence leads this court hold that there is a genuine dispute as to whether the well actually produced in November 2002.  There is sufficient evidence to create a genuine dispute of fact on the production issue.  For instance, the Office of Conservation's records show that the Searcy No. 2 well's status was changed to "shut-in" in November 2002 when the production purportedly occurred.  Those same records show that, aside from November 2002, the well did not produce anything from April 2000 until it was plugged and abandoned in January 2011 and had not produced over 200 mcf in over three years. See id., Ex. B.

Moreover, there was a discrepancy in Jeems's production records.  Jeems's initial report for November 2002 showed no production for the Searcy No. 2 well.  The 239 mcf

was added in a correction issued three months later.  See id., Ex. D.  MCLM also points to the deposition testimony of Jeems through its president, treasurer, and a landman, all of whom stated they do not recall any plans to attempt renewed production at the Searcy No. 2 well in November 2002.  See id., Ex. F.

MCLM contends that the 239 mcf attributed to the Searcy No. 2 well was actually produced by the Thigpen Estate well.  Jeems's initial report for November 2002 listed the Thigpen Estate well along with the Searcy No. 2 and Bryson wells, reporting no production for any of them.  The correction issued three months later, which attributed 239 mcf to the Searcy No. 2 well, did not list the Thigpen Estate well.  However, Jeems's production record for December 2002 reported the Thigpen Estate well produced exactly 239 mcf. See id., Ex. D.  Moreover, in contrast to the Searcy No. 2 well, the Thigpen Estate well consistently produced for several months before and after November 2002.  See id., Ex. E.

MCLM's expert, Mr. Kennedy, likewise concluded that the Searcy No. 2 well did not actually produce in November 2002.  Mr. Kennedy further concluded that, because the well last produced in April 2000, prescription of non-use extinguished the defendants' mineral servitude before they executed mineral deeds with MCLM.  See id., Ex. M.

The defendants have failed to carry their burden to show there is no genuine dispute of material fact.  MCLM has produced sufficient evidence to create a genuine dispute as to whether the Searcy No. 2 well actually produced in November 2002, thereby creating a

dispute as to whether the defendants' mineral servitude was extinguished by prescription of non-use.  Therefore, the defendants' motion for summary judgment is **DENIED**.[3]

>      **D.    The Defendants' Alternative Motion In Limine is Unfounded.**

In the event the defendants' motion for summary judgment was denied, the defendants alternatively urged a motion in limine to exclude the testimony of MCLM's expert, Mr. Kennedy, on the grounds that his opinion is "nothing more than speculation" and "based neither on sufficient facts nor on any described, much less, reliable methodology." Id.  Additionally, the defendants contend that Mr. Kennedy's opinion "is a classic example of the fallacy of argumentum ad ignorantium . . . ." Id.  For the reasons discussed below, the motion in limine is denied.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 ("Rule 702"), which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>>    (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>>
>>    (b)    the testimony is based on sufficient facts or data;
>>
>>    (c)    the testimony is the product of reliable principles and methods; and

---

[3]The defendants also rely on La. R.S. § 31.29, which provides that prescription of non-use is interrupted by "good faith" operations for the discovery and production of minerals.  Having found a genuine dispute of material fact as to whether or not the alleged production even occurred, the court does not reach the merits of MCLM's argument that the alleged production was not in "good faith" and therefore could not interrupt prescription of non-use.  See Record Documents 40 and 45.

(d)     the expert has reliably applied the principles and methods to the facts of the case.

The Supreme Court has held that Rule 702 requires the trial judge to act as a gatekeeper to ensure that all expert testimony "is not only relevant, but reliable." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589, 113 S. Ct. 2786, 2795 (1993).  This gatekeeper function applies to all forms of expert testimony.  See Kuhmo Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167 (1999).  However, this gatekeeper role is far less important in cases involving bench trials because there is no jury to expose to unreliable or misleading evidence.  See Whitehouse Hotel Ltd. P'ship, 615 F.3d 321, 330 (5th Cir. 2010); Gibbs v. Gibbs, 210 F.3d 491, 500 (5th Cir. 2000).  While Daubert lists a number of factors the court can use to determine whether an expert's testimony is sufficiently reliable, an expert's opinion must always be supported by sufficient facts and a reliable methodology. See Hathaway v. Bazany, 507 F.3d 312, 318 (5th Cir. 2007).

In support of their motion, the defendants cite to Hathaway, where the Fifth Circuit excluded expert testimony—offered personally by one of the plaintiffs—because it was not based on sufficient facts or a reliable methodology.  See id. at 318-19.  The court found the plaintiff-expert had no direct evidence in support of and did not identify any methodology he used to reach his conclusions.  See id.  In contrast, Mr. Kennedy examined the same records, reports, testimony, and other evidence analyzed and relied upon by the court in the instant ruling.  See Record Document 40, Ex. M.  Additionally, while the plaintiff-expert in Hathaway had no training in reconstructing the location of a shooter based on bullet trajectory, Mr. Kennedy has over thirty-five years of experience in the oil and gas industry. See Hathaway, 507 F.3d at 318; Record Document 40, Ex. M.

The court first notes that this matter will be tried by a judge, not a jury.  Therefore, the undersigned will be able to fully evaluate Mr. Kennedy's testimony at trial to ensure that his opinions are supported by sufficient facts and reliable methodology.  Additionally, the court finds that the defendants have not shown sufficient grounds under Rule 702 and/or Daubert to exclude Mr. Kennedy's expert testimony.  Accordingly, their motion in limine is **DENIED.**

## III.   CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is **DENIED**.  Additionally, the defendants' alternative motion in limine to exclude the testimony of Mr. Kennedy is **DENIED**.

An order consistent with the terms of this Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, on this, the 6th day of February, 2014.

_____
S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE